UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA

*IN RE:*

STANLEY J. CAIN, II,                                  CASE NO. 24-10996-JCO

Debtor.                                               Chapter 13

_____

TROY AND MICHELLE MAXWELL,

Plaintiffs,

v.                                                    Adv. Pro. No. 24-1030

CAIN AUTO & AIR LLC, II,
and STANLEY J. CAIN II, an individual,

Defendants.

## **ORDER**

     This matter came before the Court on the Adversary Complaint filed by Troy and Michelle Maxwell ("the Maxwells") against the Debtor, Stanley J. Cain II ("Cain") and Cain Auto & Air, LLC ("the LLC"), the LLC's Answer, Cain's Motion to Dismiss, Cain's Objection to the Maxwell's Proof of Claim, and the related matters which were consolidated for hearing. (AP docs. 1, 8, 10, 11, 36, 43; BK doc. 27).  Proper notice of hearing was given, appearances were noted on the record, and an evidentiary hearing was held. Upon consideration of the pleadings, briefs, testimony, exhibits, arguments, and record, this Court finds that the Maxwells' claim against Cain is due to be allowed in the amount of $39,381.01 and sufficient grounds do not exist to hold the debt non-dischargeable for the reasons below.

## JURISDICTION

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§1334 and 157, and the Order of Reference by the District Court dated August 25, 2015. The Parties consented to adjudication of all pending matters and the entry of a final judgment by this Court.

## PROCEDURAL BACKGROUND AND FINDINGS OF FACT

The Debtor, Stanley J. Cain ("Cain"), filed Chapter 13 bankruptcy on April 22, 2024. He listed Troy and Michelle Maxwell ("the Maxwells") as unsecured creditors. His schedules reflect that he owns a home located at 917 W. Peachtree Avenue in Foley, Alabama valued at $476,400.00, which is unencumbered, and 100% of "Cain Auto LLC" valued at $8,252.95. The Maxwells' filed a Proof of Claim in Cain's bankruptcy asserting an unsecured debt of $97,043.97 based on alleged breach of contract, fraud, and willful and malicious conduct. (BK ECF Claim No. 8-4). The affidavit attached to the Maxwell's claim reflects that they paid Cain $29,451.11 and incurred the following related expenses: $19,468.50 to the Wharf Marina; $8,726.19 to Springhill Suites at the Wharf; $2,285.37 to Budget Rental Car; $1,748.00 to Hertz Rental Car; $892.08 to Turo Car Rental; $1,407.08 to American Airlines; $4,422.62 to Perdido Key Management (Purple Parrot); $561.00 to Parks Canada; $208.12 to Hyatt Place Pensacola Airport; $2,633.90 to Barber Marina; $2,860.00 to Progressive Insurance, and $380.00 to Boat U.S. Towing. (BK ECF Claim 8-4 at 3). Cain objected to the Maxwell's Proof of Claim asserting lack of documentary evidence and disputing any financial obligation.

On July 26, 2024, the Maxwells filed an adversary complaint against Cain and Cain Auto & Air LLC ("the LLC") seeking non-dischargeability of their Claim based on 11 U.S.C. §523 (a)(2)(A) and 11 U.S.C. §523(a)(6). (AP Doc. 1). The Maxwells amended their Complaint requesting that if the Court

were to find the LLC is liable to the Maxwells, that it also find that the Maxwells are entitled to pierce the corporate veil and impose such liability on Cain personally. (AP doc. 8).

The trial of the Adversary Proceeding and the Objection to Claim were consolidated for hearing and the parties agreed to the entry of a final order by this Court. Pursuant to the pre-trial order the parties filed a stipulation of facts which provided a timeline of events, and states in part:[1]

| | |
|---|---|
| 3/1/2022 | Troy and Michelle Maxwell purchase 1997 Searay Sundancer 330 with twin 454 engine from Joe Collins for $31k. (π's 67). |
| 5/10/2022 | π contacts Δ for the first time. (π's 8). |
| 5/23/2022 | Terms discussed on phone or in person wanted Δ to rebuild the engine.. π paid Δ $1,500.00 to start the work. (π's 2). |
| 6/8/2022 | Parties discuss that there are more problems than just the manifolds. |
| 6/22/2022 | Parties agree that manifolds need to be replaced on both engines. |
| 6/27/2022 | Δ orders cylinder head. (π's 18). |
| 7/1/2022 | Δ creates Identifix invoice file for π. (π's 53). |
| 7/12/2022 | Δ orders fuel hoses and water heater. (π's 41 and 42). |
| 7/13/2022 | Δ orders head bolts, oil pumps, and multiple other parts. (π's 19, 20, 21, 22). |
| 7/14/2022 | Δ orders exhaust manifold (did not charge π for it on accident $2,366.72). (π's 23). Δ ordered other parts on this date as well. (π's 24 and 25). |
| 7/18/2022 | Δ orders piston parts, etc. (π's 26). |
| 7/22/2022 | Δ orders more piston parts, etc. (π's 27). |
| 8/2/2022 | Δ orders more piston parts, etc. (π's 28 and 29). |
| 8/3/2022 | π heads to AL, lets Δ know. Δ tells π that parts will not be in for several days, |
| 8/8/2022 | π needs to be in Foley. Same day π went to shop to work on boat and spent time working on the boat and around the shop. |
| 8/15-16/2022 | π asks about power washer at shop and Δ gives permission for π to use it. |
| 8/26/2022 | Δ gets blocks back from machine shop. |
| 9/1/2022 | Δ lets π know engines are being built. Δ orders spark plugs, distributor cap, and rotor. (π's 43and 45). |
| 9/3/2022 | Δ orders valve gasket. (π's 30). |
| 9/13/2022 | Parties discuss timing chain issue and it is resolved by the 14th. |
| 9/14/2022 | Δ orders timing set. (π's 31). |
| 9/16/2022 | Δ orders oil pump screen, and ignition wires. (π's 32, 33, and 34). |
| 9/20/2022 | Δ lets π know that there are specialty bolts needed and having trouble getting them. Δ says 2-3 days in text, and still assumes next day. (Banjo bolts ordered by Δ see π's 35). Δ also orders pulleys. (π's 44). |
| 9/22/2022 | |
| 9/23/2022 | Δ requests first payment since original $1500. Δ says he anticipates putting engines in 5 days later on 9/28/22. π paid Δ $9,000.00 for parts purchased to date. (π's 3 and 53, Bates #395). |

---

[1] After the Joint Stipulation was filed, a Motion to Strike was also filed and prior to the trial, the parties agreed to the Stipulated Facts on pages 1-4 and the top half of page 5, containing the timeline of events, and the reminder of the Stipulation was disputed, stricken, and not considered by the Court. (AP Doc. 40). The parties also stipulated to the admissibility of the Joint Exhibits

| | |
|---|---|
| 9/28/2022 | Parties communicate about status. Δ is finally able to get engines installed around 8 p.m. π tells Δ to get some rest. Engines in boat but not ready to go in the water. |
| 9/30/2022 | Δ orders parts for skid steer. He repaired skid steer as payment for its use. Billed π for the parts as payment for skid steer. (π's 36 and Δ's Depo page 89, line 6). |
| 10/3/2022 | Δ lets π know about problem with trailer flat tire that is keeping him from being able to launch the boat. |
| 10/7/2022 | |
| 10/9/2022 | π texts Δ at 8:30 a.m. on a Sunday for an update. |
| 10/10/2022 | |
| 10/12/2022 | Δ orders v-belt. (π's 37). |
| 10/14/2022 | Δ is out of town for Florida jet ski delivery and racing work. |
| 10/16/2022 | π texts Δ at 8 a.m. on a Sunday from Missouri asking if they should come back down. |
| 10/19/2022 | Δ returns from Florida trip. (π's Ex 46 and Δ's Depo page 103, line 10). |
| 10/26/2022 | Replacement lines arrive at shop. |
| 11/1/2022 | π states they will extend stay. |
| 11/2/2022 | |
| 11/2-12/22 | Δ is in Bahamas for racing work. He gets sick and ends up in the hospital. |
| 11/3/2022 | π goes home. |
| 11/12/2022 | Δ's girlfriend informs π that Δ is in the hospital. (Text Saturday 9:14 a.m.). |
| 11/14,18/2022 | π asks if Δ is out of hospital yet. |
| 11/23/2022 | Δ is finally out of the hospital and informs π that he is back but still unable to work. Δ unable to work again physically until January 2023. |
| 11/30/2022 | Δ orders knock sensor and alternator. (π's Ex 47 and 49). |
| 12/16/2022 | Δ orders 2nd knock sensor. (π's Ex 48). |
| 12/22/2022 | |
| 12/26/2022 | It is discovered that a "coil pigtail" part is needed. π requests update the day after Christmas at 9:30 a.m. |
| 12/27/2022 | π lets Δ know they booked flight to arrive in AL on 12/30/22 and hopes boat is ready |
| 12/29/2022 | Δ orders map sensor and throttle sensors. (π's Ex 50). |
| 12/30/2022 | π back in AL. (π's 8, 62, 64, and 65). |
| 1/1/2023 | Δ informs π they plan to have boat in the water the next day. Δ has concerns with trailer, boat bent axle. |
| 1/2/2023 | Boat is in the water and "pigtail" has been installed. Around this time Δ called every marine shop he could trying to find someone to help finish tuning them but no one wanted anything to do with those motors. (see π's 71 and Δ's depo page 113 line7). |
| 1/3/2023 | Δ orders 2nd map sensor, gasket, and manifold parts. (π's 38 and 39). |
| 1/7/2023 | π receives invoice #43 from Δ. (π's 7). |
| 1/8/2023 | Δ orders thermostat for engine. (π's 51). |
| 1/9/2023 | π pays $15,000.00 to Δ (π's 4). |
| 1/28/2023 | π writes final check for $3951.11 to Cain Auto Air. (π's 6). π purchased pass for northern part of planned "great loop trip." (π's 60). |
| 3/9/2023 | Δ tells π both engines must be removed to determine what is wrong and make repairs. Δ says will cover price of uninstall, repair, reinstall. |
| 4/26-27/2023 | Both engines are back at shop and taken apart and it is determined by Δ that both have to go back to the machine shop. (see π's 8 bates #345). |

4

| 4/28/2023 | Δ orders crankshaft parts. Never charged π, as agreed on 3/9/2023. (π's 40 and 7). |
|---|---|
| 5/2/2023 | Δ drops engines of at machine shop. Lets π know in conversation 2 days later. (see π's 8 bates #346) |
| 7/6/2023 | Δ informs π that the engines are finally finished, except one that needs bearings that are hard to find. π request the information so he can try to find on his own. (π's 8 bates #348). |
| 7/17/2023 | π states that they have had too much going on to try to find the bearings in the last 11 days. (π's 8 bates #349). |
| 9/13/2023 | π sends demand letter to Δ. Δ stopped all efforts to complete work. |
| 12/8/2023 | π files lawsuit against Δ in Baldwin County, AL. |
| 4/22/2024 | Δ files Chapter 13 bankruptcy. |
| 6/5/2024 | π files a claim in Δ's Chapter 13 with attached sworn statement. |
| 6/10/2024 | π sells "Vessel" to James R. Woodside from NOLA for $10k. (π's 73) |

(AP Doc. 40).

Troy Maxwell ("Mr. Maxwell") testified at the hearing. He stated that he and his wife, Michelle Maxwell ("Mrs. Maxwell") had been looking for a boat to do "America's Great Loop"[2] and purchased the 1997 Searay Sundancer 330 (the "Boat") because it met many criteria they needed for the trip, such as size and power. He testified that before purchasing the Boat, he had a quick inspection of the compression in the cylinders and knew at least one engine needed an overhaul. Mr. Maxwell contacted Stanley Cain ("Cain") about assisting with the Boat engines in May 2022. He said that he told Cain that he wanted to get the Boat ready with a good working motor or two for the Great Loop in the fall. Mr. Maxwell stated that Cain told him that if only one motor needed overhaul, his timeline would be four to six weeks so when he realized that the other motor needed attention too, he "assumed" it would take eight to twelve weeks to overhaul both motors. (Hrg. Transc. 9:30).

Mr. Maxwell stated that Cain evaluated the engines in June 2022, sent them to the machine shop for work, and received them back the end of August 2022. In response to Mr. Maxwell's request for an update on the motors on September 1, 2022, Cain replied "[t]hey are being built. I'll be out of town for

---

[2] Mr. Maxwell described the America's Great Loop as a "dream journey by boat " consisting of 7000-mile trip across the southern part of the United States, up the East Coast, and across Canada following all the old waterways of the 1800s.

the next 11 days. When I get back the goal will be to install the engines." Mr. Maxwell testified that he understood that communication to mean that they would be able to leave on the Great Loop trip within two weeks. (Hrg. Transc. 9:32). In September and October, Mr. Maxwell had various communications with Cain about locating and ordering additional items needed i.e., missing small parts, a new tire, damaged fuel and water lines, and fittings. (Joint Exhibit 8, 9-15). Mr. Maxwell also testified that when he visited Cain's shop on November 2, 2022, Cain was not there and another mechanic, Aaron Andrews ("Aaron"), who was assisting Cain with the engine work, was sleeping. The text messages between the parties also reflect that in November 2022, Cain was admitted to the hospital and unable to work for a few weeks.

Cain delivered the Boat to the Maxwell's boat slip on January 2, 2023. Thereafter, the parties communicated about the need for additional tweaking of the engines and Cain told the Maxwells that they needed to have the bottom of the boat cleaned and painted before additional testing could be done. Subsequent testing revealed that the engines had low oil pressure, one engine was making a "metal on metal" sound, and the other was running rough. On or about March 9, 2023, the parties met aboard the Boat and Cain told them that the engines needed to come back out and that after he handled some other jobs he would devote his attention to getting their engines taken apart, diagnosed, and fixed at no additional charge to them. Later they were told that the rods had failed and the engines were sent back to the machine shop. Subsequently, Cain advised that the bearings were "shot" and he was having difficulty finding the right ones. Upon the Maxwells inquiries in July and August 2023, Cain advised that he had not had the time or money to retrieve the engine blocks from the machine shop and that the mechanic helping with the engines, Aaron, was not consistently showing up to work. Mr. Maxwell stated that in August 2023, he and his wife lost faith in Cain's ability to complete the engine repairs and decided to consult legal counsel. Thereafter, they decided to sell the Boat, without any engines, for $10,000.00. Mr. Maxwell could not recall how many months they tried to sell it but stated that they were not able to

6

list it with a broker without engines and he could not even advertise it by placing a "for sale" sign on it, due to the Wharf's restrictions. (Hrg. Transc. 10:30:52).

Mr. Maxwell testified that in addition to the amounts that they paid to Cain, they incurred expenses for hotel stays, insurance, wharfage, rental cars, towing and trip related park fees (collectively "Additional Expenses") during the time they were awaiting the Boat repairs. On cross-examination, Mr. Maxwell acknowledged that it is difficult to discern what repairs are needed to an engine until it is broken down. He also stated that once they decided to overhaul both engines, although Cain never gave him a timeframe for completion of the additional work, he assumed it would take eight to twelve weeks. (Hrg. Transc. 10:45:10).

Michelle Maxwell ("Mrs. Maxwell") also testified at the hearing. Her testimony was consistent with Mr. Maxwell's. She testified that they were not aware of the LLC when they engaged Cain to do the work. She said she made the payments to Cain personally as he requested, except for the last one which she made payable to the LLC after the boat was delivered because the final invoice was from the LLC and she was uneasy and not happy about the situation. Mrs. Maxwell testified that in addition to their other expenses, although she didn't think it was necessary at that time, they incurred the cost of painting the bottom of the Boat because Cain required them to have it done before he could test the engines. (Hrg, Transc. 12:58:31). She also stated that they eventually ended up having to sell the Boat, " at a very cheap price."(Hrg. Transc.12:58:43).

Stanley Cain ("Cain") also testified at the hearing. He stated that after he accepted the work and got the engines disassembled, the damage was worse than anticipated and the project "snowballed." He engaged Aaron to assist and relied on him to continue working on the engines when he was out of town for other work commitments. Cain maintained that he never guaranteed delivery of the Maxwells' engines by any certain date, never instructed the Maxwells to stay in Alabama, and did not recall ever being directly asked if they should come to town. He explained that the time it took to rebuild the engines was due to the overall poor, water-damaged condition of the engines, difficulties removing bolts, delays

7

at the machine shop, problems finding parts, and unreliability of his help. He stated that the Maxwells' assumptions with regard to a delivery date were not consistent with his text message updates and explained as an example that since engines contain internal and external parts, his text message advising that he was " dropping engines in" did not mean that the motors were completed because they were not fully assembled when remounted in the boat. Cain also testified that he did not realize that the oil and fuel lines were damaged until he ran the engines and then he had difficulty finding the right ones, which caused additional delay. Cain testified that Aaron had previously been dependable, knocked out work quickly, and generally had done a good job. However, he did not meet expectations on this project and ultimately had to be terminated.

Cain acknowledged that after the Boat was delivered in January, there were still issues with the oil pressure and he advised the Maxwells that the engines needed to come back out, and he would cover the expenses of tearing them back down, figuring out what was wrong with them, and repairing them after he got some other jobs out of his shop. Cain said that he initially thought there had been a complete failure of the rods but later determined that it was the rod bearings that failed. With regard to his text message of July 22, 2023, stating that he has not had the time or money to go to Pensacola to get the engine blocks, he explained that he did not consider it a rush at that point because he was awaiting parts necessary to complete the engines.[3] Even so, Cain testified that after he had a phone call with Mr. Maxwell, he picked up one of the engine blocks[4] and was working on it when he received service of the Maxwell's complaint. Cain said it is common for projects like this to take longer than anticipated and if he had been given the chance, he would have completed the work. He also testified that he sent invoices to the Maxwells denoting the name of the LLC and that there was a sign with the name of the LLC on

---

[3] Cain testified that he had to wait for the part for the other engine because they, " . . . contacted every bearing manufacturer in the country, actually in the world because King Bearings is in Israel and they were the only ones willing to make a special run and not until November everyone else was still backed up from Covid. (Hrg. Transc. 1:49:34).
[4] He subsequently testified that the other engine block is still in the machine shop at Car City. (Hrg. Transc. 2:32).

the door of his shop.  Nevertheless he admitted cashing or depositing three of the four checks tendered by the Maxwells into his personal account.

## *ANALYSIS*

### *Adjudication of the Maxwells' Proof of Claim*

When a proof of claim is objected to, the bankruptcy court is required to determine, after notice and a hearing, whether the claim should be allowed and if so, the allowable amount of the claim. *In re Kraz, LLC*, 626 B.R. 432, 443 (M.D. Fla. 2020)(citing *In re Walston*, 606 F. App'x 543, 545-46 (11th Cir. 2015). A properly filed proof of claim consitutes prima facie evidence of the validity and the amount of the claim, creating a presumption in favor of allowance. *Fed. R. Bankr.P.* 3001(f). The burden is on the objecting party to rebut this presumption by presenting " facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim. " *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 *Collier on Bankruptcy* ¶502.02 (15th ed.1991)). Once past this threshold challenge, the burden is determined by the applicable nonbankruptcy law. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 21, 120 S.Ct. 1951, 1955, 147 L.Ed.2d 13 (2000).

#### I. The Maxwells' Breach of Contract Claim

The Maxwells' Proof of Claim states that it is based on breach of contract, fraud, and willful and malicious conduct arising from Cain's breach of an agreement to repair the engines on their Boat and provides various documents including a copy of their State Court Complaint which was pending at the time that Cain filed his Chapter 13 petition. (BK ECF Claim No. 8 ). As the State Court litigation was not concluded prior to the bankruptcy filing, the parties stipulated to adjudication of all issues by this Court. Since the Maxwell's engaged Cain to perform the work in Alabama, Alabama law governs the

9

Maxwells' state-law claims.[5] An Alabama breach of contract claim requires: (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages. See *Crespo v. Smart Health Diagnostics Co*., No. 5:23-CV-01421-HNJ, 2024 WL 2064071, at 4 (N.D. Ala. May 7, 2024). Alabama law recognizes oral contracts. *See Mobile Attic, Inc. v. Kiddin' Around of Alabama, Inc*., 72 So.3d 37, 44 (Ala. Civ. App. 2011) ("[U]nless a contract is required by law to be in writing and signed by the parties, an offeree need not sign the contract to evince his or her mutual assent to it." (citing *Denson v. Kirkpatrick Drilling Co.*, 225 Ala. 473, 144 So. 86 (Ala. 1932))); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So.2d 297, 304 (Ala. 1986) ("[A] contract may consist of several communications between the parties, some in writing and some oral, each constituting a link in the chain which comprises the entire contract"); *Gesrtenecker v. Gerstenecker*, 238 So.3d 646, 652 (Ala. 2017) ("[A]cceptance of an offer may be demonstrated by a means other than signing a written contract.").

Since there is not a formal written and signed contract between the Maxwells and Cain, the Court is left to discern the crux of any agreement from the myriad of communications between the parties. The evidence established that in May 2022, the Maxwells requested Cain's assistance in rebuilding at least one of the Boat engines. Cain agreed to perform the engine work for the Maxwells, and later agreed to enlarge the scope of the work to both engines. The evidence established that at the outset of the dealings between the parties: 1) the Maxwells communicated directly with Cain; (2) the Maxwells understood and expected Cain to personally complete the work; (3) Cain did not advise the Maxwells of the LLC; and (4) Cain did not  present the Maxwells with a written estimate, work order, or other documentation

---

[5] In cases where contract formation occurs in two or more jurisdictions, a contract typically manifests where the last act essential to the execution of the contract occurred. See *Crespo v. Smart Health Diagnostics Co*., No. 5:23-CV-01421-HNJ, 2024 WL 2064071, at *5 (N.D. Ala. May 7, 2024)' *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1049 (M.D. Ala. 2006), aff'd, 2007 WL 57097 (11th Cir. 2007) (citing *Ailey v. Nationwide Mut. Ins. Co*., 570 So.2d 598, 599 (Ala. 1990); *Ferris v. Jennings*, 851 F. Supp. 418, 421 (M.D. Ala. 1993)).

denoting that the work would be performed by the LLC. Hence, the Court finds that evidence established that the Maxwells entered into the agreement with Cain personally to perform the work on the engines.

Thereafter, the communications between the parties detail a variety of issues, including machine shop delays, difficulty finding parts, Cain's other work commitments, unreliability of individuals that Cain engaged to assist with the engine rebuilds, and Cain's health issues. Despite the Maxwells' hopeful interpretations of Cain's text updates, the evidence did not establish any clear commitment to deliver the Boat with two fully operational rebuilt engines by any certain date in September. However, as the Maxwells requested that Cain rebuild the engines, Cain accepted the job, and the Maxwells paid a total of $29,451.00 for the work, the Court finds that the parties entered into a binding agreement. Inherent therein was a duty for Cain to complete the job in a workmanlike manner within a reasonable time. As the engines were not in good working order when Cain delivered the Boat on January 2, 2023, the Court finds that he breached the Agreement. Notwithstanding this Court's finding that Cain entered into the contract with the Maxwells in his individual capacity, the Court will also address Cain's assertion that the LLC is the proper party in interest and that he should not be held personally liable for the breach.

## II. Piercing the Corporate Veil

Although the concept of a corporation as a legal entity separate from its shareholders is well settled in Alabama, in certain situations the corporate entity may be disregarded. *First Health, Inc. v. Blanton*, 585 So. 2d 1331, 1334 (Ala. 1991); see also *Hill v. Fairfield Nursing & Rehab. Ctr., LLC*, 134 So. 3d 396, 407 (Ala. 2013)(explaining that Alabama courts have looked to substance over form when evaluating whether to pierce the corporate veil). When the corporate form is being used to evade personal responsibility, courts have not been hesitant to disregard the corporate form and impose liability on the person controlling the corporation and subverting it to his personal use by the conduct of its business in a manner to make it merely his instrumentality. *C.E. Development Co. v. Kitchens*, 288 Ala. 660, 264

11

So.2d 510 (1972); see also *Bon Secour Fisheries, Inc. v. Barrentine*, 408 So.2d 490, 491 (Ala.1981) (quoting *Woods v. Commercial Contractors, Inc.*, 384 So.2d 1076, 1079 (Ala.1980)(explaining that the corporate form " will [be] disregard[ed] when it is used solely to avoid personal liability of the owner while reserving to the owner the benefits gained through use of the corporate name"); *Tri–State Building Corporation v. Moore–Handley, Inc.*, 333 So.2d 840, 841 (Ala.Civ.App.1976)(noting that the law will not recognize the corporate entity when its use by the owners or officers would promote injustice and protect the owner from payment of just obligations).

In assessing whether a corporate entity should be disregarded due to a principal's excessive use of it an "instrumentality," and "alter ego", the Alabama Supreme Court adopted a three-prong analysis. *Messick v. Moring*, 514 So. 2d 892, 894 (Ala. 1987)(citing *Kwick Set Components, Inc. v. Davidson Ind., Inc.*, 411 So.2d 134 (Ala.1982). Such analysis provides that imposition of liability on the dominant party (which can be an individual or entity) is warranted when: (1) the dominant party has complete control and domination of the company's finances, policy, and business practices so that at the time of the transaction the corporation had no separate mind, will, or existence of its own; (2) the control is misused; and 3) the misuse of this control must proximately cause the harm or unjust loss complained of. *Messick* at 894–95. The decision of whether to pierce the corporate veil is made on a case-by-case basis. *Cohen v. Williams*, 294 Ala. 417, 318 So.2d 279 (1975).

Even if the agreement here had been entered into with the LLC, piercing of the corporate veil would be warranted because Cain used the LLC as a mere instrumentality and alter ego. Cain was the sole owner of the LLC and at all pertinent times had complete control over its finances, policies, and business practices. The evidence established that Cain disregarded and misused the corporate entity in his dealings with the Maxwells. If it was his intention for the work to be performed by the LLC, as he now claims, he neglected to inform the Maxwells of the LLC at the outset of the Agreement. He failed to provide documentation such as a written contract or work order disclosing the LLC as the obligor at the outset of the work, accepted and directed that payments for the work be made to him personally, and

12

co-mingled the Maxwell's payments with his personal funds and banking account. The Maxwells testified that they reached out to Cain based on a personal recommendation and understood and expected at the time of the agreement that he would personally perform the work. Further, the text messages between the parties when the work was undertaken did not mention the LLC. The fact that Cain later engaged another person to assist with the work and ultimately delivered a final invoice denoting the LLC does not change the fact that he failed to inform the Maxwells of the LLC at the outset of the Agreement. Cain also did not introduce any evidence that the LLC was in good standing or observed the requisite corporate formalities. Thus, Cain's late attempt to shield himself from personal liability by attributing the breach to the LLC is not supported by the evidence and would promote injustice by allowing him to avert just payment obligations. Accordingly, the Court finds that *even if* the Maxwells had entered into the Agreement with the LLC, the totality of the circumstances would still warrant imposing liability for the breach of contract on Cain individually.

### *Damages For Breach of Contract Must Naturally And Proximately Result From The Breach*

Recoverable damages for breach of contract in Alabama are those that naturally and proximately result from the breach; these damages generally put the party in the same position he would have occupied if the breach had not occurred. *In re Sharpe*, 425 B.R. 620, 639–40 (Bankr. N.D. Ala. 2010)(citing *West v. Friday, Inc.*, 403 So.2d 213 (Ala.1981)). However, to be allowable, such damages must be reasonably contemplated by the parties at the time they entered into the contract. *Alabama Water Serv. Co. v. Wakefield*, 231 Ala. 112, 115, 163 So. 626, 628 (1935). Additionally, Alabama courts recognize "the long-standing rule that the law imposes upon all parties who seek recompense from another, a duty to mitigate their losses or damages." *Team Sys. Int'l LLC v. Aquate Corp*., 682 F. App'x 820, 824 (11th Cir. 2017)(citing *Avco Fin. Servs., Inc. v. Ramsey*, 631 So. 2d 940, 942 (Ala. 1994)). Under this rule, a plaintiff can recover only for that damage or loss that would have been sustained if the

13

plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss. *Id.* The reasonableness of the plaintiff's efforts to mitigate damages is a question of fact. *Id.* Damages calculations are factual determinations committed to the sound discretion of the factfinder. *Bravo v. United States*, 532 F.3d 1154, 1170 (11th Cir. 2008).

In determining the appropriate damages here, this Court must consider what if any damages naturally and proximately flowed from Cain's breach, whether those damages were foreseeable, and whether the Maxwells exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate their damages. Although the Maxwells informed Cain of their desire to embark on the Great Loop in September when they engaged him to rebuild one engine, they did not have a written contract setting any deadlines or penalties if Cain were unable to complete the work by any particular date. Mr. Maxwell by his own admission "assumed" that upon enlarging the scope of the work to both engines that their Boat would be ready within twelve weeks. Mr. Maxwell's testimony revealed that they read Cain's text updates optimistically rather than realistically. One example is Cain's September 1, 2022, text message to Mr. Maxwell stating, "[t]hey are being built. I'll be out of town for the next 11 days. When I get back the goal will be to install the engines", which Mr. Maxwell testified that he construed to mean that they would be able to leave on the Great Loop trip within two weeks. (Hrg. Transc. 9:32). The Maxwells' reading was unrealistically optimistic because Cain used the terminology "goal" and he did not promise a date that the Boat would be delivered.

Considering the text messages between the parties and the other evidence admitted, it was apparent that they did not have a meeting of the minds on the timeline for completion of the enlarged scope of work or potential consequences for failure to meet any perceived deadlines. The Maxwells' high expectations and unwillingness to accept the reality of delays coupled with Cain's inability to timely complete the work due to other commitments, machine shop delays, difficulties finding parts, unreliability of hired help, and health issues, resulted in a very unfortunate situation and a great deal of disappointment for the Maxwells.

14

As the Maxwells paid Cain to rebuild the engines that they ultimately never received back, the Court finds that at a minimum the Maxwells are entitled to a refund of what they paid to Cain. The evidence established that the Maxwells paid Cain a total of $29,451.11.[6]   Additionally, as Cain inexplicably directed the Maxwells to have the bottom of the boat cleaned and painted before he could test the engines, reimbursement of that $2,633.90 expense is also appropriate.

The evidence does not support the Maxwells' claim for losses sustained upon the sale of the Boat. Even if the Court were to *presume* that the Maxwells' decision to sell the Boat without the engines was a foreseeable consequence of Cain's breach, there is insufficient evidence to conclude that a loss of $21,000.00 was naturally and proximately caused by the breach or was reasonable. Specifically, the bill of sale documentation for the purchase of the Boat, does not denote what *if any* portion of the purchase price was attributable to the engines. As Mr. Maxwell testified that he knew the engines had issues when they purchased the Boat, and Cain testified that the engines were in worse shape than anticipated, it is unclear what *if any* value the engines may have had initially. The evidence also established that when the Maxwells decided to sell the Boat, they failed to do so in a commercially reasonable manner.  Mr. Maxwell testified that the Marina where it was located limited their ability to market the Boat and Mrs. Maxwell testified that they sold it for a "very cheap price".  As the value of the engines when the Boat was purchased was not established and there was no evidence that sale price without engines was reasonable or solely attributable to the lack of engines, the Court cannot speculate as to whether the lower sale price was due to the lack of engines, the absence of adequate marketing, or other factors. Therefore,  the Court cannot find that the reduced sale price naturally and proximately resulted from the breach or that it could have been reasonably contemplated by the parties at the time they entered into the contract.

---

[6]Although the last payment of $3951.11 was made payable to the LLC, the Court noted above that Cain solely owned the LLC, had complete control thereof, and treated it as an alter ego warranting piercing the corporate veil.

Additionally, the Court is not convinced that all the Additional Expenses the Maxwells are seeking were naturally and proximately caused by Cain's breach, were foreseeable, or were reasonable under the circumstances. It is evident that the Maxwells' stays in Orange Beach, wharfage, insurance, car rental, and park fees up until delivery of the Boat, were motivated by their hope of leaving for the "Great Loop" as quickly as possible rather than clear commitments from Cain as to a delivery date. The Maxwell's expectations and assumptions were not reasonable under the circumstances. Cain did not guarantee delivery of the Boat by September or require the Maxwells to await delivery of the Boat in Alabama. It was their choice to remain in Orange Beach and to rent vehicles to get around. They could have simply gone home and awaited Cain's clear advisement that their Boat was ready for delivery before obtaining a boat slip and traveling back to the beach. At the outset of the agreement, the Boat was taken to Cain's shop where it remained until delivery in January 2023. Thus, the Maxwells' holding of a particular boat slip at the Wharf in Orange Beach and the related expenses were not reasonable or necessary while the Boat was elsewhere.

Notwithstanding the foregoing, the wharfage charges of $7,296.00[7], which were incurred *after* the Boat was delivered to the boat slip, naturally and proximately resulted from Cain's failure to deliver the Boat with functioning engines. Such expenses were foreseeable as Cain was aware that the Boat was left essentially inoperable at the Wharf Marina awaiting his repair of the engines. Thus, the Court finds that the evidence supports allowance of damages that naturally and proximately flowed from Cains' failure to deliver the Boat as agreed with functioning engines in the amount of $39,381.01 (consisting of $29,451.11 which the Maxwell's paid to Cain for the work; $2,633.90 for the hull cleaning and painting, and $7,296.00 for wharfage (after the boat was delivered in an inoperable condition). The Maxwells are therefore entitled to an allowed unsecured claim in Cain's underlying bankruptcy of $39,381.01. Having

---

[7] This figure is the sum of the base wharfage charges as set out in Wharf Marina invoices attached to the proof of claim and contained in Plaintiff's Exhibit 66 after January 2023, exclusive of electric charges.

determined the appropriate amount of the Maxwells' claim, the Court now turns to whether the debt is non-dischargeable.

<u>*Every Breach of Contract Does Not Necessarily Give Rise to Non-Dischargeable Obligations*</u>

Denial of a debtor's discharge is an extraordinary remedy and exceptions to the discharge of a particular debt are strictly construed in favor of the debtor-defendant. *In re Reid*, 598 B.R. 674, 680 (Bankr. S.D. Ala. 2019); *In re Kanewske*, 2017 WL 4381282, at 6 (Bankr. M.D. Fla. Sept. 29, 2017). The Plaintiff has the burden of establishing the elements of non-dischargeablity by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755 (1991). It is with these considerations in mind that the Court evaluates the Maxwells' non-dischargeability claims.

<u>*Denial of Dischargeability Under 11 U.S.C. 523(a)(2)(A) Is Not Warranted*</u>

Section 523(a)(2)(A) exempts from a debtor's discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). That is, "it prevents discharge of 'any debt' respecting 'money, property, services, or ... credit' that the debtor has fraudulently obtained." *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998); *In Re Gaddy*, 977 F.3d 1051, 1056 (11th Cir. 2020). To prevail under §523(a)(2)(A), the plaintiff must prove by preponderance of the evidence that: 1) the debtor made a false representation, or engaged in other materially deceptive conduct, with intent to deceive the creditor; 2) the creditor (or other relevant party) relied on the misrepresentation/deceptive conduct; 3) the reliance was reasonably justified under the circumstances; and 4) the reliant sustained a loss as a result of the fraud/deception. *In re Kenny*, 2018

17

WL 4191477, at (Bankr. M.D. Fla. Aug. 30, 2018) (citing *In re Lloyd*, 549 B.R. 282, 291-92 (Bankr. M.D. Fla. 2016). "Actual fraud precluding discharge consists of any deceit, artifice, trick, or design ... used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Id.* (citing *In re Howard*, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001) ); *4 Collier on Bankruptcy* ¶ 523.08[1][e] (16th ed. 2017).

The Maxwells failed to prove the elements of §523(a)(2)(A) by a preponderance of the evidence. To establish that Cain's agreement to perform the engine work constituted a false representation, Plaintiffs would have had to prove that, at the time Cain entered into the Agreement, he had no intent to honor it. As noted above, Cain did not promise or guarantee to complete the engine work by a date certain, especially after the scope of the work was enlarged. It is apparent that the Maxwells' expectations were influenced more by their desire to embark on their dream trip than any representation by Cain. Although the Maxwells contend that Cain did not advise them of his other customers or commitments, there was no evidence that he ever represented to them that he would exclusively work on their job and under the circumstances, any such assumption on their part would not have been reasonable. When Cain undertook the job, he began the work of breaking down the engines, ordered parts, and engaged another mechanic, whom he believed at the time to be capable and reliable, to assist. Thereafter Cain explained that the condition of the engines was worse than anticipated, and the project "snowballed." The Maxwells were informed or otherwise aware of delays caused by the machine shop, difficulties finding parts, discovery of issues with the fuel and oil lines, unreliability of hired help, and Cain's health issues.

Hence, the facts of this case do not establish that Cain received money, property, services, or an extension, renewal, or refinancing of credit by false pretenses, a false representation, or actual fraud as required to prevail on an 11 U.S.C. §523(a)(2(A) non-dischargeability claim. Although the situation is unfortunate, the Plaintiffs failed to prove that Cain deliberately made false representations, or engaged in other materially deceptive conduct, with the intent to deceive them. Cain's testimony established that at the outset of the agreement he believed that he could complete the work and that he tried to do so, but

18

the work was more daunting than he anticipated and he encountered a litany of issues and delays, including difficulty obtaining parts in the wake of the Covid-19 pandemic. Even though, the evidence supports the conclusion that Cain breached the Agreement by failing to deliver fully functioning engines, it is well settled that not all breach of contract claims give rise to non-dischargeability. See *Lockerby v. Sierra*, 535 F.3d 1038, 1041-42 (9th Cir. 2008)(explaining that a breach of contract, even if intentional, will not establish a non-dischargeability claim, unless it is accompanied by malicious and willful tortious conduct; *In re Gross*, 639 B.R. 255, 259 (Bankr. N.D. Ga. 2022)(citing *In re Ahmed*, 2011 WL 11718017 at 8) (Bankr. N.D. Ga. Dec. 22, 2011)(noting that a breach of contract does not create a nondischargeable debt); *In re Lazzara*, 287 B.R. 714, 722 (Bankr.N.D.Ill.2002) (stating that even debts for intentional "breach of contract are not excepted from discharge."); *In re Henderson*, 423 B.R. 598, 621 (Bankr. N.D.N.Y. 2010)(recognizing that a §523(a) analysis begins with recognition of the general rule that debts and liabilities based solely upon a breach of contract are not excepted from discharge); *In re Rickabaugh*, 355 B.R. 743 (Bankr. S.D. Iowa 2006) (holding that a breach of the promise, does not establish that a representation was false. Thus, having considered the record and the evidence before it, this Court finds that the Maxwells did not establish that their claim was proximately caused by justifiable reliance on an intentionally false representation by Cain and therefore relief under 11 U.S.C. §523(a)(2(A) is not warranted.


### *The Evidence Does Not Support Denial of Dischargeability Under 11 U.S.C. 523(a)(6)*


To successfully prosecute a nondichargeability claim under 11 U.S.C. §523(a)(6), the Plaintiff must prove a willful and malicious injury by the Debtor. *In re Miller* 39 F.3d 301, 304 (11th Cir.1994)(523(a)(6) requires a deliberate or intentional injury); see also, *In re Roberts*, 594 B.R. 484, 491 (Bankr. N.D. Fla. 2018). Willfulness requires "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *In re Walker*, 48 F.3d 1161, 1163 (11th

19

Cir. 1995). Malicious means that the debtor's act be "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Id.* The debtor must commit an act "the purpose of which is to cause injury or which is substantially certain to cause injury." A negligent or even reckless act is not sufficient to except a debt from discharge under Section 523(a)(6). *Id.*; see also, *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)(explaining that nondischargeability requires a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury and as such recklessly or negligently inflicted injuries and a knowing breach of contract will not ordinarily rise to the level of "willful and malicious"); *In re Khafaga*, 419 B.R. 539, 550 (Bankr. E.D.N.Y. 2009)(recognizing that a knowing breach of contract generally does not satisfy the malicious element of §523(a)(6) absent "some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code"); *In re Luppino*, 221 B.R. 693, 700 (Bankr. S.D.N.Y. 1998)( stating "the test for non-dischargeability under Section 523(a)(6) is not greed or the gravity of misconduct, but actual malice"). Here, the Plaintiffs failed to show willful or malicious injury by Cain. As noted above, there was a litany of unintended and unanticipated circumstances that delayed the initial completion of the engines. Then upon delivery of the Boat, the engines failed. Cain testified that upon investigation he realized that the engine failure was caused by the use of the wrong bearings. His testimony established that the wrong bearings were installed due to inadvertence, accident, mistake, or ordinary negligence rather than any intentional or willful act. Thus, the Maxwells have not made the requisite showing to warrant relief under 11 U.S.C. §523(a)(6).

## CONCLUSION

For the reasons above, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. The Maxwells are awarded a judgment against STANLEY J. CAIN, II individually, in the amount of $39,381.01 on their breach of contract claims in the Adversary Proceeding.[8]

2. Cain's Objection to the Maxwell's Proof of Claim in the underlying Chapter 13 bankruptcy (ECF Claim 8-4) is GRANTED IN PART, AND OVERRULED IN PART, with the claim reduced and allowed as a general unsecured claim in the amount of $39,381.01.

3. The debt owed by Cain to the Maxwells does not meet the requirements for non-dischargeability claims under 11 U.S.C. §523 (a)(2)(A) or (a)(6) and such relief as requested in the Maxwells' Adversary Complaint is denied.

Dated: July 7, 2025

JERRY OLDSHUE
CHIEF U.S. BANKRUPTCY JUDGE

---

[8] To the extent that the Maxwell's trial brief referenced a request for attorney's fees, the Court finds that such other and further relief is not warranted because generally the trial court does not have authority to award attorney fees on basis of contract dispute between parties, where contract did not provide for such award. *Romar Dev. Co. v. Gulf View Mgmt. Corp.*, 644 So. 2d 462 (Ala. 1994). This Court did not find in favor of the Plaintiffs on their allegations of fraud, misrepresentation, or willful and malicious injury, and as such it does not find that attorney's fees are warranted under the Court's equitable powers. Further, there was no testimony or evidence offered at the hearing regarding attorney's fees or the reasonableness thereof as would be required to obtain such relief.

21